JOHNSON, Chief Justice *
| iThis matter arises from a recommendation of the Judiciary Commission of Louisiana (“Commission”) that Judge Darryl Derbigny be publicly censured, ordered to reimburse the Orleans Parish Criminal District Court Judicial Expense Fund (“JEF”) the amount of $57,359.96, and ordered to reimburse and pay to the Commission, $8,150.24 in hard costs. The recommendation stems from Judge Der-bigny’s participation in the district court’s supplemental insurance program and charges that he accepted insurance coverage and' benefits beyond those allowed by law or available to all other court employees, the premiums for which were paid from the JEF. For the following reasons, we conclude the Office of Special Counsel (“OSC”) has failed to prove by clear and convincing evidence that Judge Derbigny’s participation in the district court’s supplemental insurance program rises to the level of sanctionable misconduct under either the Code of Judicial Conduct or Article Y, Section 25(C) of the Louisiana Constitution. However, we agree with the Commission that Judge Derbigny was not entitled to the benefits of any whole life insurance policies or the Exec-U-Care program under the plain language of La. R.S. 13:691. Because Judge Derbigny has already surrendered the cash value of the whole life policies to the JEF, we order him to reimburse the JEF $10,002.58, representing l athe out-of-pocket reimbursements paid to Judge Derbigny under the Exec-U-Care program. Lastly, we decline the Commission’s request to cast Judge Derbigny with hard costs incurred' by the Commission.
*1043 FACTS AND PROCEDURAL HISTORY
Judge Derbigny was elected to Section J of Orleans Parish Criminal District Court in 2003, and has served continuously since that time. The Commission began an investigation in January of 2012 following .the broadcast of a series of news reports by New Orleans television station WWL-TV. The reports concerned the longstanding practice of the judges of the Orleans Parish Criminal District Court receiving extra insurance coverage paid for by the Criminal Court’s JEF, beyond the standard medical insurance coverage available to all court employees at the employee’s own cost.[1]
The Commission approved the filing of Formal Charge 0345 in March, of 2015, alleging that Judge Derbigny committed ethical misconduct by choosing and accepting insurance coverage and program benefits beyond those authorized by law or available to all other court employees, the premiums and other costs of which were paid with money from the JEF. The charge alleged Judge Derbigny’s acceptance and receipt of these benefits constitute supplemental income beyond what was permitted by law, and constituted- a failure to diligently 'discharge his administrative responsibilities and was a misuse of public funds. The Formal Charge further alleged that Judge Derbigny’s acceptance and receipt of these insurance coverages and program benefits resulted in multiple negative media reports 'concerning his court during a time when the court was experiencing budget problems 1¡¡and a negative Legislative Auditor’s report, bringing his court and the judiciary as a whole into disrepute. The Formal Charge alleged that Judge Derbigny’s conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2B (a judge shall not lend the prestige of judicial office to advance the private interest of the judge or others), arid 3B(1) (a judge shall diligently discharge the judge’s administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration) of the Code of Judicial Conduct'. The Formal Charge alleged that Judge Derbigny engaged in willful misconduct relating to his official duty, engaged in willful and persistent failure to perform his duties, and engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const, art. V, § 25(C).[2]
*1044 A hearing officer was appointed and convened a hearing from September 21-23, 2015. Following the hearing, the Hearing Officer filed a report with the Commission containing proposed findings of fact and ■conclusions of law. Thereafter, the Commission established a briefing schedule and ordered Judge Derbigny to appear on February 26, 2016, for questioning by the Commissioners. |4We adopt many of the Commission’s Findings of Fact, summarized below.
From 2006 to 2011,[3] the JEF made payments on policies covering Judge Der-bigny, including three long-term care policies, two life insurance policies, and a comprehensive policy covering a variety of specialized insurance categories, including term and universal life, critical illness, accidental death and dismemberment (AD & D), and cancer, heart, and ICU coverages.[4] In addition, the |fipackage of supplemental insurance policies included “Exec-U-Care,” an insurance reimbursement program that reimbursed participants for co-payments or any other out-of-pocket health expenses not covered by traditional health insurance or the supplemental benefits program. Judge Derbigny held the Exec-U-Care policy from January 5, 2006 to April 4, 2012. Two of the life insurance policies held by Judge Der-bigny, Transamerica and Sun Life, had a cash surrender value. Upon cancellation of those policies, Judge Derbigny received checks representing the cash surrender value of both policies. He then endorsed both checks over to the JEF.[5] The undisputed costs of these extra insurance coverages and program benefits relative to Judge Derbigny totaled $57,359.96, including $12,727.86 expended for the Exec-U-Care program.
The supplemental insurance program instituted by the judges of the Criminal District Court predated Judge Derbigny by at least twenty, and possibly thirty years. Judge James McKay, currently a judge of the Fourth Circuit Court of Appeal, was a judge at Criminal District Court from 1982 to approximately 1997. Judge McKay testified that the program began sometime in the late 1980’s or early *1045 1990⅛. Although some parts of the supplemental insurance program have changed since the inception of the program, key elements have remained the same, including but not limited to the use of the JEF and the availability of policies not offered to other court employees. In 1994, the Commission conducted an investigation of Criminal District Court’s supplemental insurance program. In June 1994, then-Special | ^Counsel, Steven Scheckman, sent a subpoena requesting documents related to the program to the judges of Criminal District Court. He also requested a response about the legality of the program from the judges of Criminal District Court en banc. Robert Murphy, who is now a judge of the. Fifth Circuit Court of Appeal, represented the judges of Criminal District Court in connection with the Commission’s investigation of the supplemental insurance program. Mr. Murphy gave the judges “positive advice that what they were trying to accomplish was appropriate” and that “they were not going to run afoul of the Judiciary Commission for doing what they wanted to do.”
At the end of the Commission’s deliberations on the matter, Mr. Scheckman was directed to write a letter to Judge.Jerome Winsberg, then the chief judge of Criminal District Court. Mi;. Murphy, as the judges’ attorney, was provided a copy of the letter. The August 25, 1994, letter stated that the Commission “determined that there was no judicial misconduct involving the purchase of insurance for judges....” The letter further expressed the Commission’s concern that the practice of purchasing additional insurance “may violate the original intent of the judicial parity statute, R.S. 13:691...,” and stated that the matter would be referred to the Judicial Council for further deliberation. The letter also noted an issue of “serious” concern to the Commission—the existence of a cash surrender value for some of the policies. To address this concern, the Commission requested written verification the judges had eliminated policies with a cash surrender value.
The minutes of an August 1, 1994 en banc meeting of the Criminal Court judges reveal the following motions were made, seconded, and passed unanimously: that the cash value of any policy be directed to the JEF, and that all policies be transferred to the JEF as owner. On October 6, 1994, Mr. Scheckman wrote Mr. Murphy thanking him for his “recent submissions” and stating further that he would 17now be closing out his file. According to Mr. Scheckman’s testimony in the instant matter, the Commission would have made the decision to. close out the file and thus it was reasonable to conclude that the documents sent by Mr. Murphy had satisfied the Commission’s concerns.
Regarding the Commission’s referral to the Judicial Council, Mr. Scheckman testified that the Commission “didn’t consider it an ethical violation, .... It was a legitimate policy issue. ... And they wanted a resolution to that by the Judicial Council, which is, in effect, the policymaking arm of the Supreme Court ....” Based on his own personal knowledge, Mr. Scheckman testified that, despite the Commission’s referral, the Council did not address the policy questions posed. Dr. Hugh Collins, the former Judicial Administrator of the Supreme Court, could not remember if the Commission'referred the issue to the Judicial Council. Other witnesses also did not know whether- the Judicial Council had taken any action, including Robert Murphy, Judge Winsberg, Judge Calvin Johnson, and Judge McKay. Judge McKay stated that, had the Judicial Council acted on the issue, “the whole judiciary would have been made aware.”
Newly-elected judges at Criminal District Court were enrolled in the supplemental benefits program by the Judicial *1046 Administrator of Criminal District Court. Robert Kazik, the Judicial Administrator since 2006, testified that when the new judges “showed up, we gave them a packet and said fill this out, it’s your new-hire paperwork ... just like any other employee.” Mr. Kazik’s predecessor, Elizabeth Stogner, testified that she would enroll the judges in the supplemental benefits program, including dental, vision, life insurance, and Exec-U-Care. The Hearing Officer asked; Ms, Stogner whether all of the judges availed themselves of all available policies. Ms. Stogner replied that the judges signed up for “all policies” unless a particular judge was not eligible for a certain policy due to health reasons.
| «Judge Derbigny recalled signing up for insurance benefits when he joined the court in 2003, but he characterized it as perfunctory. He stated he was summoned to the Judicial Administrator’s Office:
where I was presented, in my vague recollection, with a packet of materials, that this is—sign here, sign there, these are all part of your benefits that you are the beneficiary as a result of your election, congratulations, sign off on the dotted line and go to work. ... It just seemed to me to be part of the process of signing on as a new employee of the court.
After 2006, Judge Derbigny recalled being summoned to the Judicial Administrator’s Office to sign paperwork regarding additional policies. He acknowledged, that some of the supplemental insurance policies provided duplicative and overlapping coverage, but explained that once the situation was realized by the Judicial Administrator the judges took action and eliminated the duplicative policies. During his appearance before the Commission, Judge Derbigny reiterated that he completely relied on others to vet the legality and ethical propriety of the supplemental insurance benefits, including his predecessors in office, his colleagues, the insurance committee, and the chief judge.
In June 2011, the court received a public records request regarding the supplemental benefits program from a reporter at WWL-TV. Upon receiving the request, Judge Julian Parker, then the chief judge, requested that the judges retain counsel to examine the legality of the program’and to respond to the public.records request. The judges agreed and retained Mr. Normand Pizza. Although Mr. Pizza ultimately concluded the program was legal, the judges collectively decided to cancel their policies and to suspénd the filing of any claims in the Exec-U-Care program. Judge Derbig-ny’s cancellation letter, dated November 8, 2011, was | ^prepared by the court’s human relations specialist- and signed by Judge Derbigny:[6]
The Commission found that Judge Der-bigny’s acceptance of this large number of supplemental benefits at no cost to himself was ethically improper and constituted a violation of the Code of Judicial Conduct and-the Louisiana Constitution. Specifically, the Commission found' that Judge Der-bigny violated Canons 1, 2A, and 3B(1) of the Code of Judicial Conduct.[7] The Commission further concluded that Judge Der-bigny engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const, art. V, § 25(C).-Judge Derbigny’s participation in the supplemental benefits program over-a period of at least five years -diverted thou *1047 sands of dollars from the administration of justice, and generated negative publicity for the judicial office. However, the Commission also noted his conduct was signifi.cantly mitigated by the inaction of the Judicial Council and others who failed to properly advise ■ the Criminal District Court judges about the legality of the supplemental benefits program. Because there was no evidence presented that Judge Derbigny engaged in any intentional or willful conduct, the Commission did' not find that he engaged in willful misconduct relating to his official duty, or engaged in willful and persistent failure to perform his duties. Thus the Commission recommended that Judge Derbigny be publicly censured, ordered to reimburse JEF the amount of $57,359.96,[8] hnand ordered to reimburse and pay to the Commission $8,150.24 in hard costs.
DISCUSSION
This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const, art. V, § 25(C). This court makes determinations of fact based on the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. In re Quirk, 97-1143 (La. 12/12/97), 705 So.2d 172, 176. In addition to the substantive grounds for disciplinary action listed in the Louisiana Constitution, this court, in accordance with its supervisory authority over all- lower courts, has adopted the Code of Judicial Conduct, which is binding on all judges and violations of the Canons contained therein may serve as a basis for the disciplinary action provided for by La. Const, art. V, § 25(C). Id. The standard of proof in judicial discipline cases is the clear and convincing standard. ■ In re Chaisson, 549 So.2d 259, 263 (La. 1989). Under this. standard, the level of proof must be more than a mere preponderance of the evidence but less than beyond a reasonable doubt. In re Huckaby, 95-0041 (La. 5/22/95), 656 So.2d 292, 296.
’ Having reviewed the record, we conclude the OSC failed to prove by clear and convincing evidence that Judge Der-bigny’s participation in the court’s supplemental insurance program rose to the level of sanctionable misconduct under either the Code of Judicial Conduct or Article V, § 25(C) of the Louisiana Constitution.
The Commission found the use of JEF funds to purchase long-term care, critical illness, accidental death and dismemberment, cancer/wellness/ICU/heart, I nand hospital select portion of the court’s supplemental benefits program was authorized by law and not in violation of La. R.S. 13:691, 42:851, or 13:1381.4. La. R.S. 13:691, the judicial parity statute, provides that a judge shall not "receive “any additional salary, compensation, emolument, or benefit” for his services as a judge, ... except “(3) Payment of premiums for health, medical, dental, and hospitalization .insurance programs contributions to which shall be at the same rate as those paid by other state employees.” The statute does not limit' a 'judge to receipt of benefits offered to. state employees. Rather, a judge may receive a payment of premiums for health, medical, dental, and hospitaliza *1048 tion insurance programs, as long those payments are at the same rate as those paid by other state employees, without violating the statute. The Commission recognized, however, that La. R.S. 13:691 refers only to the health, medical, dental, and hospitalization portions of the supplemental insurance program. Thus, the Commission noted the statute does not explicitly authorize payments relative to life insurance or insurance reimbursement programs such as Exec-U-Care.
Additionally, the Commission concluded the supplemental benefits program did not violate La. R.S. 42:851.[9] That statute would require the court to seek approval | i2from the Office of Group Benefits to contract for these supplemental benefits, but only if premiums are paid “in whole or in part with state funds.” Here, the premiums for the supplemental benefits program were paid by the JEF. These funds are not state funds within the meaning of La. R.S. 42:851, See Dejoie v. Medley, 08-2223 (La. 5/5/09), 9 So.3d 826.
The Commission also considered La. R.S. 13:1381.4, the statute authorizing the JEF, which prohibits the payment of salary from the fund to any judges of the court.[10] However, the Commission found *1049 that because Section (D) of the statute uses the specific term “salary”- instead of the more general term “compensation,” it does not refer to the long-term care, critical illness, AD & D, cancer/wellness/ICU, or hospital select portions of the supplemental benefits program.
| ¡Despite these findings, the Commission found the OSC had proven by clear and convincing evidence that respondent violated Canons 1, 2A, and 3B(1). Although we agree with the Commission’s interpretation and application of the relevant statutes relative to the legal propriety of the supplemental insurance benefits under review in this case, we disagree with the Commission’s ultimate conclusion that the OSC proved a violation of the Code of Judicial Conduct by clear and convincing evidence.
Canon 1, entitled “A Judge Should Uphold the Integrity'and Independence of the Judiciary,” provides:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
Part A of Canon 2 of the Code entitled, “A Judge Should Avoid Impropriety and , the Appearance of Impropriety in All Activities,” states:
A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence ■in the integrity and impartiality of the judiciary. •
Part B of Canon 3 of the Code, entitled “Administrative Responsibilities,” provides in pertinent part in Paragraph (1):
A judge shall diligently discharge the judge’s administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration. ...
We find the, OSC failed to prove that Judge Derbigny did not maintain professional competence in the administration of his court and did not uphold the integrity of his court under the facts of this case.
First, although the Commission cited to the “large number” of supplemental benefits accepted by Judge Derbigny, there is no prohibition or limitation in La. R.S. |1413:691(B) in either the number of policies or the costs of the supplemental insurance program, as long 'as those polices otherwise comply with the law. There is no showing by the OSC in this record that the insurance premiums attributed to Judge Derbigny exceeded those of any other judges or state employees. Similarly, there was nothing in the expense reports provided to the judges that would have caused Judge Derbigny or others to' question the benefits offered. Further, the record establishes that once the duplicative coverages were pointed out to him, Judge Derbig-ny took appropriate action to cancel the duplicative policie'S.
Additionally, while we agree with the Commission that the life insurance policies and expense reimbursement policies, such as-Exec-U-Care, are not specifically referenced in La. R.S. 13:691, we do not find clear and convincing evidence that Judge *1050 Derbigny failed to maintain professional competence in the administration of the court with regard to these policies. As the Commission and the Hearing Officer reiterated, the supplemental benefits program at issue preceded Judge Derbigny’s election to. the court by at least twenty years, and the History of that program was muddied at best. Based on the record and testimony, it is apparent that a multitude of elected judges have benefited from these same supplemental benefits over perhaps thirty years. There was no evidence that Judge Derbigny knew of potential irregularities or participated in the procurement of the policies. Pursuant to the 1994 letter from the Special Counsel to the judges of the court, life insurance policies with cash surrender'values should not have been obtained by the court, but the Commission agreed Judge. Derbigny would not have been aware of the. Commission’s prior admonition to the court. Instead, the record supports the Commission’s finding that new judges were presented with information about the supplemental benefits, including these life ' insurance policies, along with the regular group benefits, and that this presentation gave the appearance that the supplemental |1Rbenefits were a part of an overall benefits package given to every judge, and otherwise gave the indication to Judge Derbigny that the benefits were legal and fully vetted by his colleagues and predecessors.
With regard to the term life insurance policies and the Exec-U-Care program, the Commission cited testimony in the record that the supplemental insurance program it had investigated in 1994 was substantially similar to the supplemental insurance program in which Judge Der-bigny participated between 2006 and 2011. Although the OSC argues the record is hot clear that these policies were'included in the program in effect in 1994, we find sufficient evidence in the record to conclude otherwise. Bryan Wagner, an independent insurance agent, testified that he sold numerous insurance policies to the Criminal District Court judges beginning in the early 1990’s, including group life insurance policies. He also recalled selling the judges the Exec-U-Care program beginning in 2006, although he could not recall whether other medical reimbursement polices, such as Exec-U-Care, were in effect prior to 2006. Robert Eazik, the Judicial Administrator of Criminal District Court since 2006, also testified regarding his knowledge of the- supplemental benefits program. Mr. Kazik has been employed at Criminal District Court for more than 26 years and testified the supplemental policies, including an Exec-U-Care type policy, came into existence in the early 1990’s. Elizabeth Stogner, Judicial Administrator of the Criminal District Court from 2000 to 2006, testified she enrolled the judges'.in these policies, includ-. ing Exec-U-Care, during her term as Judicial Administrator, although she could not recall when the court approved the supplemental policies. Former Criminal District Court Judge McKay testified the supplemental insurance program went into effect in the late 1980’s or early 1990’s and Exec-U-Care was part of .the supplemental insurance program in 1994 (when the program was investigated by the Judiciary Commission). Judge Camille Buras, elected' as- a Criminal ■District [1flCourt judge in 1998, testified she was aware the judges before her had the same supplemental benefits, including Exec-U-Care. Finally, Steve Scheckman, Special Counsel for the Judiciary Commission from 1994 to 2008, testified- that the supplemental insurance program in 1994 included substantially the same policies offered by the program under review in this matter. He further testified the benefits program in 1994 included the same type of .expense reimbursement policy providing the same coverage as the Exec-U-Care policy, al *1051 though he was not sure if it was called “Exec-U-Care.”
The Judiciary Commission in 1994 determined there was no judicial misconduct relative to the payment for these supplemental benefits for the judges. The only differentiation was with regard to life insurance policies with cash surrender values. We are hard-pressed to discern the reasoning behind the Commission’s current reversal of its view in 1994 that the judges had not engaged in any judicial misconduct by participating in the supplemental benefits program, but that Judge Derbigny, who was elected to the bench in 2003, has committed judicial misconduct by participating in substantially the same supplemental benefits program. There is no dispute that JEF funds are no longer used to pay for the judges’ supplemental insurance policies. And, going forward, our ruling makes clear that a judge’s acceptance of these particular benefits would not be authorized by La. R.S. 13:691. However, based on the particular facts of this case, we decline to find Judge Derbigny’s acceptance of these benefits in the past to be an ethical violation. The record clearly establishes that the supplemental benefits program investigated in 1994 included both life insurance policies and a medical expense reimbursement program, such as the Exec-U-Care program. The OSC found no misconduct relative to term life insurance policies or the Exec-U-Care benefits, and singled out only life insurance polices with cash surrender values as an item of concern. Judge Derbigny’s Inactions, viewed in light of the OSC’s prior investigation and findings, do not constitute ethical misconduct.
Furthermore, although a judge cannot simply rely on others, such as his judicial predecessors or his administrative staff, to have vetted the insurance policies he was offered, we do not find that Judge Derbig-ny “wholly abdicated his ethical responsibilities” with regard to. the supplemental insurance benefits at issue. The Commission found that Judge Derbigny violated the Code of Judicial Conduct and the Louisiana Constitution by his “over reliance” on his predecessors and court administrative personal. However, the record contains, no indication that Judge Derbigny was ever put on notice prior to 2011 that the supplemental benefits program was legally or .ethically improper. The prograpa that Judge Derbigny joined in 2003 had been in place for at least 20 years. Even if he had made his own inquiry into the propriety of the criminal court’s supplemental insurance benefits program, he would have found no indication of disapproval of the program by the Commission (other, than the cash value policies), the Judicial Council, or any other authority. The record shows that following its investigation of the- program in 1994, neither the OSC nor the -Commission addressed the issue of the criminal court’s supplemental insurance program again until 2011, when it commenced the instant proceedings. The OSC has not made a showing that Judge Derbigny knew or should have known that his participation in the criminal court’s supplemental benefits program was not both legal and ethically permissible. The Commission agreed with Judge Derbigny that his level of culpability in this matter is greatly diminished by his lack of guidance from the judicial branch and by the actions of his predecessors. Under the particular circumstances of this case, especially the scope and convoluted history of the criminal court’s supplemental benefits program—a history the Commission itself recognized as “complicated,” along with the Commission’s shifting viewpoints on 11sthe propriety of parts of the program, we conclude the OSC failed to show that Judge Derbigny’s conduct rose to the level of a violation of the Code of Judicial Conduct or that he violated La. Const, art. V, *1052 § 25(C) by engaging in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
Nevertheless, while we do not find that Judge Derbigny’s conduct rose to the level of a violation of the Code of Judicial Conduct, we ultimately agree with the Commission that La. R.S. 13:691(B) by its very language does not reference life insurance policies or the type of reimbursement program offered under the Exec-U-Care program. While Judge Derbigny argues that the Exec-U-Care program was a medical benefits program, we agree with the Commission that the program was not “insurance,” but was instead a program to reimburse participants for out-of-pocket medical and dental expenses. Accordingly, we order Judge Derbigny to reimburse the JEF $10,002.58 in out-of-pocket reimbursements to Judge Derbigny.[11] Because the Commission in 1994 found no judicial misconduct for participating in such a program, we decline to cast Judge Derbigny for the premiums and administrative fees paid to Exec-U-Care.
CONCLUSION
In sum, we conclude the Office of Special Counsel has failed to prove by clear and convincing evidence that Judge Der-bigny’s participation in the criminal district court’s supplemental insurance program rose to the level of sanctionable misconduct under either the Code of Judicial Conduct or Article V, § 25(C) of the Louisiana Constitution. However, we find the plain language of La. R.S. 13:691 does not reference either life insurance or a reimbursement program as provided by the | ^Exec-U-Care policy, and thus such policies were not authorized by law. Judge Derbigny has surrendered to the JEF the cash value of the whole life insurance policies. Accordingly, we order him to reimburse the JEF $10,002.58, representing the out-of-pocket reimbursements paid to Judge Derbigny under the Exec-U-Care program. Because we find no sanctionable misconduct on the part of Judge Derbig-ny, we decline the Commission’s request to cast Judge Derbigny with hard costs incurred by the Commission.
DECREE
For the reasons assigned, it is ordered that Judge Darryl A. Derbigny reimburse the Criminal Court Judicial Expense Fund $10,002.58.

 Knoll, J„ retired, participated in this decision which was argued prior to her retirement.

. An audit report issued by the Louisiana Legislative Auditor in November 2012 concluded in part that the judges of the Criminal District Court had improperly used public funds to provide themselves with supplemental and additional insurance benefits contrary to law.

. La. Const, art. V, § 25(C) provides: "On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judi’cial office into disrepute, conduct while in .office which would constitute a felony,' or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules *1044 implementing this Section and providing for confidentiality and privilege of commission proceedings.”

. Records maintained by Criminal District Court covering the period prior to 2006 were destroyed in Hurricane Katrina; therefore, only the 2006 to 2011 time frame is at issue here.

. Long-Term Care policies

• Conseco/Washington National, January 1, 2006 to October 17, 2011

• Transamerica GB-5001024, April 29, 2010 to October 4, 2011
• Transamerica GB-5001042, January 17, 2006 to October 4,2011

Life Insurance policies

• Mutual of Omaha, June 1, 2007 to Octobers, 2011
• Sun Life, March 5, 2010 to October 3, 2011
• Transamerica OR-166 (term life), January 5, 2009 to November 29, 2011 • Transamerica OR-166 (universal life), November 30, 2009 to October 25, 2011

Critical Illness policies

• Transamerica OR-166, January 26, 2006 to November 25, 2008
• Transamerica OR-166, November 30, 2009 to November 29, 2011

AD & D policies

• Mutual of Omaha, June 1, 2007 to October 3,2011
• Transamerica OR-166, January 26, 2006 to November 29,2011

CancerlWellness/ICUlHeart policy

• Transamerica OR-166, January 26, 2006 to November 29, 2011

Hospital Select policy

• Transamerica OR-166, January 26, 2006 to November 29, 2011

.The cash surrender value of the Trans-america Life policy was $97.39; the cash surrender value of the Sun Life policy was $6,314.76.

. Judge Derbigny did not cancel Exec-U-Care until April 2012; however, the Commission made no finding that Judge Derbigny made any claim under this program after November 2011.

. The Commission did not find a violation of Canon 2B, as there was no evidence presented that Judge Derbigny used the prestige of his judicial office to receive supplemental benefits.

. The total amount expended by the JEF on supplemental benefits for Juc}ge Derbigny was . $57,359.96,.broken down as follows:
• Conseco/Washington National: $5,566.29
• Transamerica GB-5001024: $2,821.72
• Transamerica GB-5001042: $10,222.36
• Mutual of Omaha: $1,656,00
• Sun Life: $8,277.57
• Transamerica OR-166: $16,088.16
• , Exec-U-Care: $12,727,86, which; consisted of $10,002.58 in out-of-pocket reimbursements to-Judge Derbigny, $1,625.00 in premiums, and $1,100.28 in administrative fees.

. La. R.S. 42:851 provides in pertinent part as follows:
A. The state of Louisiana, through the Office of Group Benefits and each of its governmental and administrative subdivisions, departments, or agencies of the executive, legislative, or judicial branches, ... are authorized to:
(1) Procure private contracts of insurance covering their respective employees, officials, and department heads, or any class or classes thereof, and the dependents of such employees, officials, or department heads under a policy or policies of group health, accident, accidental death and dismemberment, and hospital, surgical, or medical expense benefits. ...
B. Each such private contract or self-funded program, the premiums of which are paid in whole or in part with state funds, shall be approved by the Office of Group Benefits, except that any city or parish school board may enter into such private contract or' self-funded program without approval. The employee or retiree eligibility provided in such private contract or self-funded program must be identical to the eligibility provided in the Office of Group Benefits programs.

. La. R.S. 13:1381.4 provides:
A. (1) In all criminal cases over which the Criminal District Court for Orleans Parish has original, appellate, supervisory, or concurrent jurisdiction, including traffic violations other than parking, there shall be taxed as costs against every defendant who is convicted after trial or plea of guilty or nolo contendere or who forfeits his bond the sum of five dollars, which shall be in addition to all other fines, costs, or forfeitures lawfully imposed and which shall be transmitted to the judicial administrator of the Criminal District Court for Orleans Parish for further disposition in accordance herewith.
(2) In addition to all other fines, costs, or forfeitures lawfully imposed by this Section or any other provision, the court may impose an additional cost against any defendant who has been finally convicted of a misdemeanor, excluding traffic violations, or a felony. The additional costs authorized in this Paragraph shall not exceed five hundred dollars in the case of a misdemeanor nor exceed two thousand five hundred dollars in the case of a felony. All such sums collected shall be transmitted to the judicial administrator for further disposition in accordance herewith,
B. The judicial administrator of the Criminal District Court for Orleans Parish shall place all sums collected or received under this Section in a separate account to be designated as the judicial expense fund for the Criminal District Court for Orleans Parish. The judges of the court shall cause to be conducted annually an audit of the fund and the books and accounts relating thereto and shall file the same with the office of the legislative auditor where it shall be available for public inspection.
C. The judicial expense fund is established and may be used for any purpose connected with, incidental to, or related to the proper *1049 administration or function of the court or the office of the judges thereof and is in addition to any and all other funds, salaries, expenses, or other monies that are provided, authorized, or established by law.
D. No salary shall be paid from the judicial expense fund to any judges of the court.

. See In re Granier, 04-3031 (La. 6/29/05), 906 So.2d 417, 420.